**LITE DEPALMA GREENBERG & AFANADOR, LLC**
Joseph J. DePalma
Catherine B. Derenze
570 Broad St., Suite 1201
Newark, NJ 07102
Telephone: (973) 623-3000
Facsimile: (973) 623-0858
jdepalma@litedepalma.com
cderenze@litedepalma.com

[Additional Counsel on Signature Page]

*Attorneys for the Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **JOHN MOSS & STEPHANIE DEMARO**, *individually and on behalf of all others similarly situated*,<br><br>                      Plaintiffs,<br><br>   v.<br><br>**PRUDENTIAL FINANCIAL, INC. d/b/a/ THE PRUDENTIAL INSURANCE COMPANY OF AMERICA**,<br><br>                      Defendant. | Civil Action No.<br><br><br>**CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiffs John Moss and Stephanie Demaro ("Plaintiffs") bring this Class Action Complaint, individually and on behalf of all others similarly situated (the "Class Members"), against Defendant Prudential Financial, Inc. d/b/a The Prudential Insurance Company of America ("Prudential" or "Defendant"), and allege as follows, based upon information and belief, investigation of counsel, and the personal knowledge of Plaintiffs.

<u>**NATURE OF CASE**</u>

1. This class action arises out of the recent targeted cyberattack and data breach where unauthorized third-party criminals retrieved and exfiltrated the highly sensitive data of Plaintiffs

and over 2.5 million Class Members, as a result of Defendant's failure to reasonably and adequately secure this highly sensitive consumer data (the "Data Breach") and failure to adequately train its employees on reasonable cybersecurity protocols.

2.      During the regular course of conducting its daily business, Defendant acquires, collects, stores, and transfers its customers' and their beneficiaries' sensitive personal data, including personally identifying information ("PII") and personal health information ("PHI") (collectively, "Private Information"). More specifically, Defendant acquired Plaintiffs' and other Class Members' Private Information while providing products and services, including life insurance, health insurance, annuities, retirement-related services, mutual funds, and investment management. Plaintiffs and Class Members are current and former customers and the beneficiaries of those customers, who provide their sensitive Private Information to Defendant directly or indirectly in connection with those products and services.

3.      Prudential claimed that on February 5, 2024, it had detected that "[a] threat actor, who [Prudential] suspect[ed] to be a cybercrime group," had "gained unauthorized access," beginning on February 4, 2024, to Prudential's "administrative and user data from certain technology systems and a small percentage of Company users accounts associated with employees and contractors."[1] On February 12, 2024, Prudential filed a brief Form 8-K with the SEC disclosing the attack in which it stated that it "d[id] not have any evidence that the threat actor has taken customer or client data" that Prudential's customers had entrusted to it.[2]

4.      However, Prudential's initial assessment of the Data Breach changed. On Friday, March 29, 2024, Prudential filed a data breach notification with the Maine Attorney General that

---

[1] Prudential Financial, Inc., Form 8-K, United States Securities and Exchange Commission (Feb. 12, 2024).
[2] *Id.*

stated the personal information of 36,545 customers "related to [their] Prudential products and services," including name, address, driver's license number, and non-driver identification card number had been exfiltrated in the Data Breach.[3] Then, Prudential changed its assessment of the Data Breach a second time. On Friday, June 28, 2024, Prudential amended its notice of data breach with the Maine Attorney General's Office to reveal the Data Breach actually had impacted 2,556,210 of its customers.[4] The filing did not state what categories of personal information had been exfiltrated by cybercriminals;[5] however, in a separate filing on the same date with the Office of the Attorney General of Iowa, Prudential revealed the affected customer information included: Social Security number, credit and debit card information, financial account information, driver's license, treatment, diagnosis and prescription information, and health condition information.[6]

5.    Prudential did not begin sending notices out to individuals affected by the Data Breach until late March and only sent those notices "on a rolling basis." On July 1, 2024, a spokesperson for Prudential stated that its "notifications are substantially complete," though did not confirm that all affected individuals had been notified.[7]

6.    The Private Information compromised in the Data Breach included at least Plaintiffs' and Class Members' first name, last name, address, date of birth, policy numbers, addresses, email addresses, phone numbers, Social Security numbers, credit card information,

---

[3] *Data Breach Notifications*, Maine Attorney General, https://apps.web.maine.gov/online/aeviewer/ME/40/2605118e-36eb-44d8-933a-2e084c069f84.shtml (Mar. 29, 2024).
[4] *Data Breach Notifications*, Maine Attorney General, https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/cc7a25d8-bb55-485b-b3bc-060aa12004dd.html (June 28, 2024).
[5] *Id.*
[6] *Data Breach Notice*, Iowa Attorney General, https://www.iowaattorneygeneral.gov/media/cms/6282024_Prudential_Insurance_Compan_ED906E8233AB8.pdf (June 28, 2024).
[7] https://therecord.media/prudential-breach-revision-exposed-data

debit card information, financial account information, driver's license information, health treatment information, health diagnosis information, prescription information, and health condition information.

7.      As an entity that provides health insurance, Defendant is subject to HIPAA's privacy rules because it knowingly obtains, collects, and stores PHI. Defendant, therefore, has a duty to secure, maintain, protect, and safeguard the Private Information in its possession against unauthorized access and disclosure through reasonable and adequate data security measures.  In light of dozens of recent cyberattacks targeting the healthcare industry and exfiltrating highly sensitive healthcare information and resulting ransoms, at the time of the Data Breach, Defendant was well aware that Private Information is extremely valuable to cybercriminals.

8.      This was not even the first data breach Defendant had to notify its customers about over the last year. On July 31, 2023, Prudential filed a notice of data breach with the Attorney General of Maine following an attack on one of its vendors. The 2023 incident exposed the Social Security numbers, phone numbers, and addresses of 320,840 Prudential customers.

9.      Given dozens of recent cyberattacks targeting the healthcare industry and exfiltrating highly sensitive healthcare information and resulting ransoms. and the 2023 data breach, this made it highly foreseeable that Defendant would be the target of a cyberattack.

10.     Despite its duties under the law to Plaintiffs and Class Members to protect and safeguard their Private Information, and the foreseeability of a data breach, Defendant failed to implement reasonable and adequate data security measures, which directly resulted in a Data Breach.

11.     Defendant owed a non-delegable duty to Plaintiffs and Class Members to implement reasonable and adequate security measures to protect their Private Information. Yet,

1000029.1

Defendant maintained and shared the Private Information in a negligent and/or reckless manner. In particular, Defendant's failure to adequately train its employees on proper cybersecurity measures.

12.     Plaintiffs' and Class Members' Private Information was compromised due to Defendant's negligent and/or reckless acts and omissions and Defendant's repeated failure to reasonably and adequately protect Plaintiffs' and Class Members' Private Information.

13.     Now armed with the Private Information accessed in the Data Breach, cybercriminals can use or sell the Private Information to further harm Plaintiffs and Class Members in a variety of ways including: destroying their credit by opening new financial accounts and taking out loans in Class Members' names; using Class Members' names to improperly obtain medical services; using Class Members' Private Information to target other phishing and hacking intrusions; using Class Members' Private Information to obtain government benefits; and otherwise assuming Class Members' identities.

14.     As a result of the Data Breach, Plaintiffs and Class Members face a substantial risk of imminent harm relating to the exposure and misuse of their Private Information. Plaintiffs and Class Members have and will continue to suffer injuries associated with this risk, including but not limited to a loss of time, mitigation expenses, and anxiety over the misuse of their Private Information.

15.     Plaintiffs and Class Members have incurred, and will continue to incur, damages in the form of, among other things, identity theft, attempted identity theft, lost time and expenses mitigating harms, increased risk of harm, damaged credit, diminished value of Private Information, loss of privacy, and/or additional damages as described below.

16.     Accordingly, Plaintiffs brings this action against Defendant, seeking redress for

Defendant's unlawful conduct and asserting claims for: (i) negligence; (ii) negligence *per se*; (iii) breach of implied contract; (iv) unjust enrichment; (v) bailment; and (vii) breach of fiduciary duty.

17.     Through these claims, Plaintiffs seeks damages in an amount to be proven at trial, as well as injunctive and other equitable relief, including reasonable and adequate improvements to Defendant's data security systems, policies, and practices, the implementation of annual audits reviewing the same, adequate credit monitoring services funded by Defendant, and payment for the costs of repairing damaged credit as a result of the Data Breach.

## THE PARTIES

18.     Plaintiff John Moss is a natural person, resident, and citizen of the Commonwealth of Pennsylvania.

19.     Plaintiff Stephanie Demaro is a natural person, resident, and citizen of the Commonwealth of Pennsylvania.

20.     Defendant Prudential is a New Jersey corporation with its principal place of business at 751 Broad Street Newark, New Jersey 07102.

## JURISDICTION AND VENUE

21.     This Court has original jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) because Plaintiffs, and at least one member of the putative Class, as defined below, are citizens of a different state than Defendant, there are more than 100 putative Class Members, and the amount in controversy exceeds $5 million exclusive of interest and costs.

22.     This Court has general personal jurisdiction over Defendant because Defendant has its principal places of business in this district, and Defendant operates in and engages in direct commerce at this District.

23.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendant's

6

principal place of business is located in this District, a substantial part of the events giving rise to this action occurred in this District, and Defendant has harmed Class Members residing in this District.

## DEFENDANT'S BUSINESS

24.    Prudential is a financial services and investment manager with approximately $1.551 trillion of assets under management as of March 31, 2024, and operations in the United States, Asia, Europe, and Latin America.[8]

25.    Prudential offers a wide array of products and services, including life insurance, health insurance, annuities, retirement-related services, mutual funds, and investment management.

26.    Plaintiffs and Class Members are former or current customers who used Defendant's products and services, either directly or indirectly.

27.    While providing its customers with products and services, Defendant receives, creates, handles, and transfers its customers' Private Information. Indeed, to receive products and services from Defendant, Plaintiffs and Class Members were required to provide highly sensitive Private Information, including some or all of the following:

- Full names and addresses;

- Personal email addresses and phone numbers;

- Dates of birth;

- Social Security numbers;

- Driver's licenses (or other similar state identifications);

---

[8] Prudential Financial Inc., Form 8-K, United States Securities and Exchange Commission (July 2, 2024).

- Health information including but not limited to information about diagnosis, treatment, prescriptions, and health condition; and

- Information related to credit and debit card numbers, bank account statements and financial account details.

28.     This sort of Private Information is extremely sensitive and is extremely valuable to criminals because it can be used to commit serious identity and medical identity theft crimes.

29.     Upon information and belief, Defendant promises to, among other things: keep Private Information private; comply with healthcare insurance industry standards related to data security and Private Information, including FTC guidelines; inform consumers of its legal duties and comply with all federal and state laws protecting consumer Private Information; only use and release Private Information for reasons that relate to the products and services Plaintiffs and Class Members obtain from Defendant and provide adequate notice to individuals if their Private Information is disclosed without authorization.

30.     As a HIPAA covered business entity, as discussed *infra*, Defendant is required to implement adequate safeguards to prevent unauthorized use or disclosure of Private Information, including by implementing the requirements of the HIPAA Security Rule and to report any unauthorized use or disclosure of Private Information, including incidents that constitute breaches of unsecured PHI, as in the case of the Data Breach complained of herein.

31.     However, despite the existence of these duties, Defendant did not maintain adequate security to protect its systems from infiltration by cybercriminals or adequately train its employees on reasonable cybersecurity protocols.

32.     By obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class Members' Private Information, Defendant assumed legal and equitable duties owed to Plaintiffs

and Class Members and knew or should have known that they were responsible for protecting Plaintiffs' and Class Members' Private Information from unauthorized disclosure.

33.     Yet, contrary to Defendant's representations, Defendant failed to implement adequate data security measures, as evidenced by Defendant's admission of the Data Breach, which affects, to date, over 2.5 million individuals.

**<u>Defendant is a Covered Entity Subject to HIPAA</u>**

34.     Defendant is a covered entity as its services and products include a Long-Term Care Insurance Plan and an Individual Health Plan (collectively, the "Plans").[9] As a regular and necessary part of its business as an insurer, Defendant collects, stores, and transfers the highly sensitive PHI of its customers.

35.     As a covered entity, Defendant is required under federal and state law to maintain the strictest confidentiality of the PHI it acquires, receives, collects, transfers, and stores. Defendant is further required to maintain sufficient safeguards to protect that PHI from being accessed by unauthorized third parties.

36.     Due to the nature of Defendant's insurance businesses, which includes providing insurance for individuals in need of long-term care such as nursing homes, assisted living, and a home health aide,[10] and providing individual health insurance plans,[11] Defendant would be unable to engage in its regular business activities without collecting and aggregating PHI it knows and

---

[9] *HIPAA Notice of Privacy Practices*, PRUDENTIAL, https://www.prudential.com/links/hipaa (last accessed July 10, 2024).
[10] Prudential, *Long-Term Care: What to Know and How to Plan*, PRUDENTIAL, https://www.prudential.com/financial-education/understanding-long-term-care (last accessed July 10, 2024).
[11] Prudential, *Affordable Individual Health Insurance Plans*, https://www.prudential.com/wps/portal/production/prudential/personal/health-insurance (last accessed July 10, 2024).

understands to be sensitive and confidential.

37.    As Prudential acknowledges in its "HIPAA Notice of Privacy Practices," HIPAA requires that Defendant use adequate safeguards to prevent unauthorized use or disclosure of PHI, including by implementing the HIPAA Security Rule and immediately report any unauthorized use or disclosure of PHI (such as the Data Breach) to affected individuals.[12]

38.    For its part, Defendant explicitly touted its commitment to protecting the privacy of Private information, for its insurance-related products and services as well as its financial products and services, including life insurance, annuities, retirement-related services, mutual funds, and investment management, claiming that:

> Prudential values your business and your trust. We respect the privacy of your personal information and take our responsibility to protect it seriously. This privacy notice is provided on behalf of the Prudential companies . . . and applies to our current and former customers.
>
> . . . .
>
> We maintain physical, electronic, and procedural safeguards to protect your personal information. The people authorized to access your personal information need it to do their jobs, and we require that they keep your information secure and confidential.[13]

39.    Likewise, in its "Online Privacy Statement," Prudential promises:

> **Social Security Numbers**
> Prudential collects Social Security numbers in the course of its business activities. Prudential has a privacy policy that is designed to protect personal information, including Social Security numbers. This policy requires that Prudential have measures in place to keep all personal information about its customers and employees, and employees of our vendors and business partners, secure and

---

[12] The HIPAA Security Rule establishes national standards to protect individuals' electronic personal health information that is created, received, used, or maintained by a covered entity. The Security Rule requires appropriate administrative, physical, and technical safeguards to ensure the confidentiality, integrity, and security of electronic protected health information. See 45 C.F.R. Part 160 and Part 164, Subparts A and C.

[13] *US Consumer Privacy Notice*, PRUDENTIAL, https://www.prudential.com/links/privacy-policy (last accessed July 10, 2024).

confidential.

**Retention Period**
Prudential retains personal information for as long as needed or permitted in light of the purpose(s) for which it was obtained and consistent with applicable law.

. . . .

**Security**
Prudential seeks to use reasonable administrative, technical and physical safeguards and other security measures to protect personal information within our organization.[14]

40.    Prudential also states in its "Online Privacy Statement" that it uses Plaintiffs' and Class Members' Private Information to provide its customers "tailored content and marketing messages;" "operate, evaluate, and improve our business (including developing new products and services; improving existing products, services and Online Services; performing data analytics; and performing accounting, auditing, and other internal functions;" and "manage infrastructure and other business operations."[15]

41.    By obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class Members' Private Information, Defendant assumed legal and equitable duties and knew or should have known that they were responsible for protecting Plaintiffs' and Class Members' Private Information from unauthorized disclosure.

42.    Plaintiffs and Class Members are or were customers, or the beneficiaries of those customers, whose Private Information was maintained by Defendant and entrusted Defendant with their Private Information.

43.    Plaintiffs and Class Members relied on Defendant to implement and follow

---

[14] *Online Privacy Statement*, PRUDENTIAL, https://www.prudential.com/links/privacy-statement (last accessed July 10, 2024).
[15] *Id.*

1000029.1

adequate data security policies and protocols, to keep their Private Information confidential and securely maintained, to use such Private Information solely for business and healthcare purposes, and to prevent unauthorized disclosures of Private Information. Plaintiffs and Class Members reasonably expected that Defendant would safeguard and keep their Private Information confidential.

44.    As described throughout this Complaint, Defendant failed to reasonably and adequately protect, secure, and/or store Plaintiffs' and Class Members' Private Information and failed to adequately train its employees on reasonable cybersecurity protocols, prior to, during, or after the Data Breach, but rather, enacted unreasonable data security measures and employee training protocols they knew or should have known were insufficient to reasonably protect the highly sensitive Private Information that they maintained. Consequently, cybercriminals circumvented Defendant's security measures, resulting in a significant Data Breach.

### The Data Breach of Defendant's Systems

45.    Beginning on or around February 4, 2024, Defendant was subjected to a cyberattack which compromised the sensitive Private Information of Plaintiffs and Class Members.

46.    In a Form 8-K filed with the SEC, Prudential noted that it learned on February 5, 2024, a threat actor had "gained unauthorized access" to Prudential's "administrative and user data from certain technology systems and a small percentage of Company users accounts associated with employees and contractors."[16]

47.    Prudential's SEC notice also stated that Prudential was investigating the Data

---

[16] Prudential Financial, Inc., Form 8-K, United States Securities and Exchange Commission (Feb. 12, 2024).

Breach:

> We continue to investigate the extent of the incident, including whether the threat actor accessed any additional information or systems, to determine the impact of the incident. On the basis of the investigation to date, we do not have any evidence that the threat actor has taken customer or client data. We have reported this matter to relevant law enforcement and are informing regulatory authorities.[17]

48.    However, the SEC notice, dated February 12, 2024, did not state whether the threat actor still had unauthorized access to Prudential's systems.

49.    In fact, on or about February 16, 2024, the cybercrime group "Blackcat" (also known as "ALPHV," referred to hereinafter as "ALPHV Blackcat") claimed credit on its darknet site for the attack and claimed that it still had access to Prudential's systems.[18]

50.    ALPHV Blackcat is a notorious cybercriminal group. As of December 19, 2023, ALPHV Blackcat "ha[d] targeted the computer networks of more than 1,000 victims and caused harm around the world since its inception, including networks that support U.S. critical infrastructure."[19] The U.S. Department of Justice also stated on that date that "ALPHV/Blackcat has emerged as the second most prolific ransomware-as-a-service variant in the world based on the hundreds of millions of dollars in ransoms paid by victims around the world."[20]

51.    As time progressed, Prudential revealed more and more of its customers and former customers, as well as their beneficiaries, had their Private Information exfiltrated by, upon information and belief, ALPHV Blackcat.

---

[17] *Id.*

[18] Eduard Kovacs, *Ransomware Group Takes Credit for LoanDepot, Prudential Financial Attacks*, SECURITYWEEK, (Feb. 19, 2024), https://www.securityweek.com/ransomware-group-takes-credit-for-loandepot-prudential-financial-attacks/.

[19] *Justice Department Disrupts Prolific ALPHV/Blackcat Ransomware Variant*, U.S. Department of Justice, (Dec. 19, 2023) https://www.justice.gov/opa/pr/justice-department-disrupts-prolific-alphvblackcat-ransomware-variant.

[20] *Id.*

52. First, on Friday, March 29, 2024—the weekend of the Easter Holiday, Prudential filed a data breach notification with the Maine Attorney General that stated the personal information of 36,545 customers "related to [their] Prudential products and services," including name, address, driver's license number, and non-driver identification card number had been exfiltrated in the Data Breach.[21] The March 29, 2024 notice also finally confirmed that cybercriminals no longer "ha[d] access to [Prudential's] systems."[22]

53. Second, Prudential reported to the Secretary of the United States Department of Health and Human Services on April 22, 2024, that a "Hacking/IT Incident" of its "Network Server" resulted in the exposure of PHI of 36,092 individuals.[23]

54. And third, on Friday, June 28, 2024, Prudential amended its notice of data breach with the Maine Attorney General's Office to reveal the Data Breach actually had impacted 2,556,210 of its customers.[24] The filing did not state what categories of personal information had been exfiltrated by cybercriminals;[25] however, in a separate filing on the same date with the Office of the Attorney General of Iowa, Prudential revealed the affected customer information included: Social Security number, credit and debit card information, financial account information, driver's license, treatment, diagnosis and prescription information, and health condition information.[26]

---

[21] *Data Breach Notifications*, Maine Attorney General, https://apps.web.maine.gov/online/aeviewer/ME/40/2605118e-36eb-44d8-933a-2e084c069f84.shtml (Mar. 29, 2024).

[22] *Id.*

[23] U.S. Department of Health and Human Services, *Cases Currently Under Investigation*, https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf (last accessed July 10, 2024).

[24] *Data Breach Notifications*, Maine Attorney General, https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/cc7a25d8-bb55-485b-b3bc-060aa12004dd.html (June 28, 2024).

[25] *Id.*

[26] *Data Breach Notice*, Iowa Attorney General, https://www.iowaattorneygeneral.gov/media/cms/6282024_Prudential_Insurance_Compan_ED906E8233AB8.pdf (June 28, 2024).

14

55.     Prudential's investigation determined that Plaintiffs' and Class Members' Private Information was compromised in the Data Breach. Specifically, Prudential's investigation discovered that personal information including Plaintiffs' and Class Members' first name, last name, address, date of birth, policy numbers, addresses, email addresses, phone numbers, Social Security numbers, credit card information, debit card information, financial account information, driver's license information, health treatment information, health diagnosis information, prescription information, and health condition information.

56.     Yet, Prudential waited almost *two months* after it initially discovered the Data Breach to begin notifying affected individuals and, to date, has not completed the notification process as Prudential has been notifying affected individuals on a "rolling basis."

57.     Beginning late March, Prudential sent Plaintiffs and other Class Members a Data Breach Notice which said the following:

**What Happened?**

On February 5, 2024, Prudential detected unauthorized third-party access to certain company systems and data. We promptly activated our incident response plan and launched an investigation into the nature and scope of the issue with assistance from external cybersecurity experts. We also reported this matter to relevant law enforcement. Through the investigation, we learned that the unauthorized third party gained access to our network on February 4, 2024 and removed a small percentage of personal information from our systems.

58.     Omitted from the Data Breach Notice is information explaining the root cause of the Data Breach, the vulnerabilities exploited by the cybercriminals, and Defendant's prior data breach history to ensure similar breaches do not continue to occur exposing customers' Private Information. To date, these omitted details have not been explained or revealed to Plaintiffs and Class Members, who retain a vested interest in ensuring that their Private Information is not repeatedly exposed to cybercriminals by Defendant.

1000029.1

59.     Upon information and belief, ALPHV Blackcat specifically targeted Defendant based on its status as an insurer and financial services and product provider with enormous amounts of valuable Private Information—including the Private Information of Plaintiffs and Class Members.

60.     Plaintiffs further believe that their and Class Members' Private Information has been or soon will be disseminated on the dark web, to be available for purchase, because that is the *modus operandi* of cybercriminals.

61.     As a HIPAA covered business entity that collects, creates, transfers, and maintains significant volumes of Private Information, the targeted attack was a foreseeable risk which Defendant was aware of, had previously and recently been affected by, and knew they had a duty to guard against. It is well-known that covered entities, such as Defendant, which collect and store confidential and sensitive Private Information of millions of individuals, are frequently targeted by cyberattacks. Further, cyberattacks are highly preventable through the implementation of reasonable and adequate cybersecurity safeguards, including proper employee cybersecurity training.

62.     The U.S. Department of Health and Human Services ("HHS") and the Office of Consumer Rights urges HIPAA entities to encrypt data containing sensitive personal information. To underscore the necessity of doing so to protect consumers' data, as far back as 2014, the Department fined two covered entities approximately two million dollars for failing to encrypt laptops containing sensitive personal information. In announcing the fines, Susan McAndrew, formerly OCR's deputy director of health information privacy, stated that "[o]ur message to these organizations is simple: *encryption is your best defense against these incidents*." Despite these fines and warnings, Defendant failed to encrypt Plaintiffs' and Class Members' Private

Information.

63.    The Data Breach was a targeted cyberattack expressly designed to gain access to and exfiltrate private and confidential data, including (among other things) the Private Information of patients, like Plaintiffs and Class Members.

64.    Defendant had obligations created by HIPAA, the FTC, contract, industry standards, and common law to keep its customers' and former customers', as well as their beneficiaries', Private Information confidential and protected from unauthorized access and disclosure.

65.    Plaintiffs and Class Members entrusted Defendant with their Private Information with the reasonable expectation and mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

66.    By obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class Members' Private Information, Defendant assumed legal and equitable duties and knew, or should have known, they were responsible for protecting Plaintiffs' and Class Members' Private Information from unauthorized disclosure.

67.    Due to Defendant's inadequate security measures, failure to adequately train its employees on reasonable cybersecurity protocols, and its delayed notice to victims, Plaintiffs and Class Members face a present, immediate, and ongoing risk of fraud and identity theft that they will have to deal with for the rest of their lives.

**The Data Breach was a Foreseeable Risk of which Defendant Were on Notice**

68.    The attack was entirely foreseeable and avoidable.

69.    First, this Data Breach is not the only data breach Defendant suffered over the past year. In July 2023, Defendant experienced another data breach which exposed the PII of 320,840

individuals, including their Social Security Numbers.[27]

70.     Second, in a Joint Cybersecurity Advisory issued on December 19, 2023, the Federal Bureau of Investigation ("FBI") and the Cybersecurity & Infrastructure Security Agency ("CISA") encouraged critical infrastructure organizations, such as Defendant, to implement their various recommendations as set forth in the advisory to reduce the likelihood and impact of inevitable ALPHV Blackcat ransomware and data extortion efforts.[28]   The FBI and CISA provided various step-by-step technical details associated with the ALPHV Blackcat criminal organization and its attack techniques, and advised organizations of "actions to take today," which included "prioritize remediation of known exploited vulnerabilities."

71.     Third, as HIPAA-covered entities handling Private Information, Defendant's data security obligations were particularly important given the substantial increase in cyberattacks and data breaches in the healthcare industry and other industries holding significant amounts of PII and PHI preceding the Data Breach.

72.     At all relevant times, Defendant knew, or should have known that Plaintiffs' and Class Members' Private Information was a target for malicious actors.  Yet, Defendant failed to implement and maintain reasonable and appropriate data privacy and security measures to protect Plaintiffs' and Class Members' Private Information from cyberattacks that Defendant knew directly about and should have guarded against.

73.     Healthcare entities suffered at least 337 data breaches in the first half of 2022 alone, according to Fortified Health Security's mid-year report released in July 2022. The percentage of

---

[27] *Data Breach Notifications*, MAINE ATTY GEN, https://apps.web.maine.gov/online/aeviewer/ME/40/e2a5ab4c-3947-4a2e-a9fe-b58eec80686c.shtml (last visited July 10, 2024).
[28] *#StopRansomware: ALPHV Blackcat*, AMERICA'S CYBER DEFENSE AGENCY (Dec. 19, 2023), https://www.cisa.gov/news-events/cybersecurity-advisories/aa23-353a.

healthcare data breaches attributed to malicious activity rose more than five percentage points in the first six months of 2022 to account for nearly 80 percent of all reported incidents.[29]

74.    In light of recent high profile cybersecurity incidents at other healthcare entities and their partners—including HCA Healthcare (11 million patients, July 2023), Managed Care of North America (8.8 patients, March 2023), Shields Health Care Group (2 million patients, March 2022), Broward Health (1.3 million patients, January 2022), OneTouchPoint (2.6 million patients, July 2022), Trinity Health (3.3 million patients, May 2020), and American Medical Collection Agency (25 million patients, March 2019)—Defendant knew or should have known its electronic records would be targeted by cybercriminals.

75.    PHI is particularly valuable and has been referred to as a "treasure trove for criminals."[30] A cybercriminal who steals a person's PHI can end up with as many as "seven to 10 personal identifying characteristics of an individual."[31] A study by Experian found that the "average total cost" of medical identity theft to the victims of such theft was "about $20,000" per victim, per incident in 2010, and that a majority of victims of medical identity theft were forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[32]

76.    In fact, according to the cybersecurity firm Mimecast, 90 percent of healthcare organizations experienced cyberattacks in 2020.[33]

---

[29] *See* Jill McKeon, *Health Sector Suffered 337 Healthcare Data Breaches in First Half of Year*, HEALTH IT SECURITY: CYBERSECURITY NEWS (July 19, 2022), https://healthitsecurity.com/news/health-sector-suffered-337-healthcare-data-breaches-in-first-half-of-year.

[30] *See* Andrew Steger, *What Happens to Stolen Healthcare Data?*, HEALTHTECH MAGAZINE (Oct. 30, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon (quoting Tom Kellermann, Chief Cybersecurity Officer, Carbon Black, stating "Health information is a treasure trove for criminals.").

[31] *Id.*

[32] Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (Mar. 3, 2010), https://www.cnet.com/news/privacy/study-medical-identity-theft-is-costly-for-victims/.

[33] *See* Maria Henriquez, *Iowa City Hospital Suffers Phishing Attack*, SECURITY MAGAZINE

77.    Cyberattacks on medical systems have become so common that in 2019 the FBI and U.S. Secret Service issued a warning to potential targets, so they are aware of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive . . . because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[34]

78.    This was not the FBI's first warning to the healthcare industry about the threat of cyberattacks.  Indeed, cyberattacks against the healthcare industry have been common for over a decade, with the FBI warning as early as 2011 that cybercriminals were "advancing their abilities to attack a system remotely" and "[o]nce a system is compromised, cyber criminals will use their accesses to obtain PII[.]" The FBI further warned that "the increasing sophistication of cyber criminals will no doubt lead to an escalation in cybercrime."[35]  Later, in August 2014, after a cyberattack on Community Health Systems, Inc., the FBI warned companies within the healthcare industry that hackers were targeting them. The warning stated that "[t]he FBI has observed malicious actors targeting healthcare related systems, perhaps for the purpose of obtaining the Protected Healthcare Information (PHI) and/or Personally Identifiable Information (PII)."

79.    According to an article in the HIPAA Journal posted on November 2, 2023, cybercriminals hack into medical practices for their highly prized medical records. "[T]he number of data breaches reported by HIPAA-regulated entities continues to increase every year. 2021 saw 714 data breaches of 500 or more records reported to the [HHS' Office for Civil Rights (OCR)] –

---

(Nov. 23, 2020), https://www.securitymagazine.com/articles/93988-iowa-city-hospital-suffers-phishing-attack.

[34] *FBI, Secret Service Warn of Targeted Ransomware*, Law360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware.

[35] Gordon M. Snow, *Statement before the House Financial Services Committee, Subcommittee on Financial Institutions and Consumer Credit*, FBI (Sept. 14, 2011), https://archives.fbi.gov/archives/news/testimony/cyber-security-threats-to-the-financial-sector.

an 11% increase from the previous year. Almost three-quarters of those breaches were classified as hacking/IT incidents."[36]

80.     According to the HIPAA Journal's 2023 Healthcare Data Breach Report, "[a]n unwanted record was set in 2023 with 725 large security breaches in healthcare reported to the Department of Health and Human Services Office for Civil Rights, beating the record of 720 healthcare security breaches set the previous year."[37]

81.     Healthcare organizations are easy targets because "even relatively small healthcare providers may store the records of hundreds of thousands of patients. The stored data is highly detailed, including demographic data, Social Security numbers, financial information, health insurance information, and medical and clinical data, and that information can be easily monetized."[38] In this case, Defendant failed to reasonably and adequately protect the stored records of *hundreds of millions* of patients—roughly one-third of all Americans.

82.     Private Information, like that stolen from Defendant, is "often processed and packaged with other illegally obtained data to create full record sets (fullz) that contain extensive information on individuals, often in intimate detail." The record sets are then sold on dark web sites to other criminals and "allows an identity kit to be created, which can then be sold for considerable profit to identity thieves or other criminals to support an extensive range of criminal activities."[39]

---

[36] Steve Alder, *Editorial: Why Do Criminals Target Medical Records*, THE HIPAA JOURNAL (Nov. 2, 2023), https://www.hipaajournal.com/why-do-criminals-target-medical-records.
[37] Steve Adler, *Security Breaches in Healthcare in 2023*, The HIPAA Journal (January 31, 2024), https://www.hipaajournal.com/wp-content/uploads/2024/01/Security_Breaches_In_Healthcare_in_2023_by_The_HIPAA_Journal.pdf.
[38] *See id.*
[39] *See id.*

83.    The American Medical Association ("AMA") has also warned healthcare entities about the importance of protecting their patients' confidential information:

> Cybersecurity is not just a technical issue; *it's a patient safety issue*. AMA research has revealed that 83% of physicians work in a practice that has experienced some kind of cyberattack. Unfortunately, practices are learning that *cyberattacks not only threaten the privacy and security of patients' health and financial information, but also patient access to care.*[40]

84.    The Data Breach resulting in the theft of Plaintiffs' and Class Members' Private Information poses a known patient safety issue, including the interruption of important medical services.

85.    Given the wealth of information from the law enforcement and healthcare industry concerning the increasing prevalence of cyberattacks, Defendant knew and should have known about its data security vulnerabilities and implemented enhanced and adequate protection to protect and secure Plaintiffs' and Class Members' Private Information.  Knowing the risk, Defendant failed to do so.

### Defendant's Failure to Comply with FTC Guidelines

86.    The Federal Trade Commission ("FTC") has regularly promulgated guidelines for businesses, including HIPAA entities, which highlight the necessity of implementing reasonable data security practices. According to the FTC, the need for data security should factor into all business decision-making.

87.    For example, in 2016, the FTC updated its published guidelines, *Protecting Personal Information: A Guide for Business*, which laid out standard and accepted cyber-security

---

[40] Andis Robeznieks, *Cybersecurity: Ransomware attacks shut down clinics, hospitals*, AM. MED. ASS'N (Oct. 4, 2019), https://www.ama-assn.org/practice-management/sustainability/cybersecurity-ransomware-attacks-shut-down-clinics-hospitals.

1000029.1

measures for businesses to implement to protect consumers' private data. The guidelines advise businesses, *inter alia*, to: encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[41]

88.    The FTC's guidelines further advise businesses:  not to maintain PII longer than necessary for authorization of a transaction; to limit access to sensitive data; to require complex passwords to be used on networks; to use industry-tested methods for security; to monitor for suspicious activity on the network; and to verify that third-party service providers have implemented reasonable security measures.[42]

89.    To underscore the binding significance of the promulgated guidance, the FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, pursuant to Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further identify the measures businesses *must* take to meet their data security obligations consistent with federal law.

90.    These FTC enforcement actions include actions against healthcare providers and partners like Defendant. *See, e.g.*, *In the Matter of LabMD, Inc., A Corp*, No. 9357, 2016 WL 4128215, at *32 (F.T.C. July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act."), *vacated on other grounds, LabMD, Inc. v. Fed. Trade Comm'n*, 894 F.3d 1221 (11th Cir. 2018).

91.    Defendant's failure to employ reasonable and appropriate measures to protect

---

[41] *Protecting Personal Information: A Guide for Business*, FEDERAL TRADE COMMISSION (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.
[42] *Id.*

against unauthorized access to its customers' and former customers', as well as their beneficiaries', Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

92.     Defendant was at all times fully aware of its obligations to protect the Private Information of customers. Defendant was also aware of the significant repercussions that would result from their failure to do so.

**Defendant's Failure to Comply with Accepted Industry Standards for Data Security**

93.     In light of the evident threat of cyberattacks seeking consumers' Private Information, several best practices have been identified by regulatory agencies and experts that, at a minimum, should be implemented by healthcare service providers like Defendant to secure Plaintiffs' and Class Members' Private Information, including but not limited to: educating and training all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data; monitoring and limiting the network ports; protecting web browsers and email management systems; and limiting which employees can access sensitive data.

94.     On information and belief, Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

95.     These foregoing frameworks are existing and applicable industry standards in the healthcare industry, and Defendant failed to comply with these accepted standards, thereby

opening the door to and causing the Data Breach.

### **Defendant's Failure to Comply with Their HIPAA Obligations to Safeguard Private Information**

96.    As a health plan handling medical patient data, Defendant is a covered entity under HIPAA (45 C.F.R. § 160.103) and is required to comply with the HIPAA Privacy Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and C ("Security Standards for the Protection of Electronic Protected Health Information").

97.    HIPAA requires covered entities to protect against reasonably anticipated threats to the security of sensitive patient health information.

98.    Defendant is subject to the rules and regulations for safeguarding electronic forms of medical information pursuant to the Health Information Technology Act ("HITECH"). *See* 42 U.S.C. § 17921, 45 C.F.R. § 160.103.

99.    HIPAA's Privacy Rule or *Standards for Privacy of Individually Identifiable Health Information* establishes national standards for the protection of health information that is kept or transferred in electronic form.

100.    HIPAA covered entities must implement safeguards to ensure the confidentiality, integrity, and availability of PHI. These safeguards include physical, technical, and administrative components.

101.    The Data Breach is considered a breach under the HIPAA Rules because it involved an access of PHI not permitted under the HIPAA Privacy Rule:

> A breach under the HIPAA Rules is defined as "the acquisition, access, use, or disclosure of PHI in a manner not permitted under the [HIPAA Privacy Rule] which compromises the security or privacy of the PHI." *See* 45 C.F.R. 164.40

102.    The Data Breach resulted from a combination of multiple failures by the Defendant to adequately and reasonably secure the Plaintiffs' and Class Members' Private Information in violation of the mandates set forth in HIPAA's regulations.

**Defendant's Failure to Adequately and Reasonably Secure Plaintiffs' and Class Members' Private Information has Increased Their Risk of Fraud and Identity Theft**

103.    Cyberattacks and data breaches at covered entities like Defendant are especially problematic because they can negatively impact the overall daily lives of individuals affected by the attack.

104.    The United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft face "substantial costs and time to repair the damage to their good name and credit record."[43]

105.    That is because any victim of a data breach is exposed to serious ramifications regardless of the nature of the data. Indeed, the reason criminals steal PII is to monetize it. They do this by selling the spoils of their cyberattacks on the black market to identity thieves who desire to extort and harass victims and take over victims' identities to engage in illegal financial transactions under the victims' names. Because a person's identity is akin to a puzzle, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity, or otherwise harass or track the victim. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique known as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses

---

[43] *See* U.S. Gov. Accounting Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), *available at* https://www.gao.gov/new.items/d07737.pdf.

previously acquired information to manipulate individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails.

106.    The FTC recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[44]

107.    Moreover, theft of Private Information is also gravely serious because Private Information is an extremely valuable property right.[45]

108.    Its value is axiomatic, considering the value of "big data" in corporate America and the fact that the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

109.    It must also be noted there may be a substantial time lag – measured in years – between when harm occurs and when it is discovered, and also between when Private Information and/or financial information is stolen and when it is used.

110.    According to the GAO, which conducted a study regarding data breaches:

[L]aw enforcement officials told us that in some cases, stolen data

---

[44] *See IdentityTheft.gov*, FEDERAL TRADE COMMISSION, https://www.identitytheft.gov/Steps (last visited Dec. 11, 2023).
[45] *See, e.g.*, John T. Soma, et al, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets*, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

> may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

> GAO Report at 29.

111.    Private Information is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years.

112.    Thus, Plaintiffs and Class Members must vigilantly monitor their financial and medical accounts, or the accounts of deceased individuals for whom Class Members are the executors or surviving spouses, for many years to come.

113.    Private Information can sell for as much as $363 per record according to the Infosec Institute.[46] Private Information is particularly valuable because criminals can use it to target victims with frauds and scams. Once Private Information is stolen, fraudulent use of that information and damage to victims may continue for years.

114.    Medical information is especially valuable to identity thieves.

115.    Theft of PHI, in particular, is gravely serious: "[a] thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other care. If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."[47]

116.    Drug manufacturers, medical device manufacturers, pharmacies, hospitals, and

---

[46] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/.
[47] *See* Federal Trade Commission, *What to Know About Medical Identity Theft*, http://www.consumer.ftc.gov/articles/0171-medical-identity-theft (last visited Dec. 11, 2023).

other healthcare service providers often purchase PHI on the black market for the purpose of target marketing their products and services to the physical maladies of the data breach victims themselves. Insurance companies purchase and use wrongfully disclosed PHI to adjust their insureds' medical insurance premiums.

117.    Because of the value of its collected and stored data, the medical industry has experienced disproportionally higher numbers of data theft events than other industries.

118.    For this reason, as a health insurer, Defendant knew or should have known about these dangers and strengthened its data and email handling systems as well as their training of employees in cybersecurity protocols accordingly. Defendant was on notice of the substantial and foreseeable risk of harm from a data breach, yet Defendant failed to properly prepare for that risk.

### Defendant's Failure to Adequately and Reasonably Protect Against The Data Breach was Reckless and Negligent

119.    Defendant breached its obligations to Plaintiffs and Class Members and/or were otherwise negligent and reckless because they failed to properly maintain and safeguard their computer systems and data to protect and/or to implement adequate data security oversight and practices necessary to safeguard stored Private Information. Defendant's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

    a.    Failing to maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks;

    b.    Failing to adequately protect customers' Private Information;

    c.    Failing to properly monitor its own data security systems for existing intrusions;

    d.    Failing to train its employees in the proper handling of emails containing Private Information and maintain adequate email security practices;

e.    Failing to train its employees train all staff members on the policies and procedures with respect to Private Information as necessary and appropriate for staff members to carry out its functions and to maintain the security of Private Information;

f.    Failing to ensure the confidentiality and integrity of electronic PHI they created, received, maintained, and/or transmitted, in violation of 45 C.F.R. § 164.306(a)(1);

g.    Failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

h.    Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1)(i);

i.    Failing to implement procedures to review records of information system activity regularly, such as audit logs, access reports, and security incident tracking reports in violation of 45 C.F.R. § 164.308(a)(1)(ii)(D);

j.    Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

k.    Failing to protect against reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

1000029.1

l.    Failing to ensure compliance with HIPAA security standard rules by its workforce in violation of 45 C.F.R. § 164.306(a)(4);

m.    Failing to train all members of its workforce effectively on the policies and procedures regarding PHI as necessary and appropriate for the members of its workforce to carry out its functions and to maintain security of PHI, in violation of 45 C.F.R. § 164.530(b);

n.    Failing to render the electronic Private Information it maintained unusable, unreadable, or indecipherable to unauthorized individuals, as it had not encrypted the electronic PHI as specified in the HIPAA Security Rule by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without use of a confidential process or key" (45 CFR § 164.304's definition of "encryption");

o.    Failing to comply with FTC guidelines for cybersecurity, in violation of Section 5 of the FTC Act;

p.    Failing to adhere to industry standards for cybersecurity as discussed above; and

q.    Otherwise breaching its duties and obligations to protect Plaintiffs' and Class Members' Private Information.

120.    Defendant negligently, recklessly, and unlawfully failed to safeguard Plaintiffs' and Class Members' Private Information by allowing cyberthieves to access Defendant's computer network and systems which contained unsecured and unencrypted Private Information, upon information and belief, for multiple days.

121.    Accordingly, as outlined below, Plaintiffs and Class Members now face an

1000029.1

increased risk of fraud and identity theft. In addition, Plaintiffs and Class Members also lost the benefit of the bargain they made with Defendant.

## **Plaintiffs' and Class Members' Damages**

122.    Given the sensitivity of the Private Information involved in this Data Breach, Plaintiffs and Class Members have all suffered damages and will face a substantial risk of additional injuries for years to come, if not the rest of their lives. Defendant has done nothing to compensate Plaintiffs or Class Members for many of the injuries they have already suffered. Defendant has not demonstrated any efforts to prevent additional harm from befalling Plaintiffs and Class Members as a result of the Data Breach.

123.    Plaintiffs and Class Members have been damaged by the compromise of their Private Information in the Data Breach, which is now in the hands of cybercriminals.

124.    Since being notified of the Data Breach, Plaintiffs have spent time dealing with the impact of the Data Breach, valuable time Plaintiffs otherwise would have spent on other activities, including but not limited to time with their families, work and/or recreation.

125.    Due to the Data Breach, Plaintiffs anticipate spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. This includes changing passwords, cancelling credit and debit cards, and monitoring her accounts for fraudulent activity.

126.    Plaintiffs' and Class Members' Private Information was compromised as a direct and proximate result of the Data Breach.

127.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have been placed at a present, imminent, immediate, and continuing increased risk of harm from fraud and identity theft.

128.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have been forced to spend time dealing with the effects of the Data Breach.

129.    Plaintiffs and Class Members face substantial risk of out-of-pocket fraud losses such as loans opened in their names, medical services billed in their names, tax return fraud, utility bills opened in their names, credit card fraud, and similar identity theft.

130.    Plaintiffs and Class Members face substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on Plaintiffs' and Class Members' Private Information as potential fraudsters could use that information to more effectively target such schemes to Plaintiffs and Class Members.

131.    Plaintiffs and Class Members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

132.    Plaintiffs and Class Members also suffered a loss of value of their Private Information when it was acquired by cyber thieves in the Data Breach. Numerous courts have recognized the propriety of loss of value damages in similar cases.

133.    Plaintiffs and Class Members were also damaged via benefit-of-the-bargain damages. Plaintiffs and Class Members overpaid for a service that was intended to be accompanied by adequate data security that complied with industry standards but was not. Part of the price Plaintiffs and Class Members paid to Defendant was intended to be used by Defendant to fund adequate security of their computer system(s) and Plaintiffs' and Class Members' Private Information. Thus, Plaintiffs and Class Members did not get what they paid for and agreed to.

134.    Plaintiffs and Class Members have spent and will continue to spend significant amounts of time monitoring their accounts and sensitive information for misuse.

135.    Plaintiffs and Class Members have suffered or will suffer actual injury as a direct result of the Data Breach. Many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

  a. Reviewing and monitoring sensitive accounts and finding fraudulent insurance claims, loans, and/or government benefits claims;

  b. Purchasing credit monitoring and identity theft prevention;

  c. Placing "freezes" and "alerts" with reporting agencies;

  d. Spending time on the phone with or at financial institutions, healthcare providers, and/or government agencies to dispute unauthorized and fraudulent activity in their name;

  e. Contacting financial institutions and closing or modifying financial accounts; and

  f. Closely reviewing and monitoring Social Security numbers, medical insurance accounts, bank accounts, and credit reports for unauthorized activity for years to come.

136.    Moreover, Plaintiffs and Class Members have an interest in ensuring that their Private Information, which is believed to remain in the possession of Defendant, is protected from further breaches by the implementation of security measures and safeguards, including but not limited to, making sure that the storage of data or documents containing Private Information is not accessible online and that access to such data is password protected.

137.    Further, as a result of Defendant's conduct, Plaintiffs and Class Members are forced to live with the anxiety that their Private Information—which contains the most intimate

details about a person's life, including what ailments they suffer from, whether physical or mental—may be disclosed to the entire world, thereby subjecting them to embarrassment and depriving them of any right to privacy whatsoever.

138.    As a direct and proximate result of Defendant's actions and inactions, Plaintiffs and Class Members have suffered anxiety, emotional distress, loss of time, loss of privacy, and are at an increased risk of future harm.

## Plaintiffs' Experiences

### Plaintiff Moss's Experience

139.    Plaintiff Moss obtained life insurance through Prudential and utilized Prudential for its products and services related to investments. Plaintiff Moss also purchased life insurance policies for his daughter and his grandson, as well as opening a Roth IRA account for his daughter through Prudential. Plaintiff Moss closed the accounts for his daughter and grandson about 10 years ago. To use Defendant's services and products, Plaintiff Moss—like other Class Members—provided sensitive Private Information including his full name, address, date of birth, insurance information, and more.

140.    Defendant obtained and continues to store and maintain Plaintiff's Private Information. Defendant owes Plaintiff Moss a legal duty and obligation to protect his Private Information from unauthorized access and disclosure. Prudential notified Plaintiff Moss on June 24, 2024, nearly five months after it had discovered the Data Breach, that Plaintiff Moss's Private Information was compromised in the Data Breach and disclosed as a result of Defendant's inadequate data security practices.[48]

---

[48] Attached as Exhibit "A" is the redacted June 24, 2024 Notice of Security Incident received by Plaintiff Moss.

141.    Over five months after the Data Breach, Defendant has yet to confirm the exact information that was compromised in the Data Breach. However, on information and belief, Class Members' compromised data includes, but is not limited to: customer first name, last name, address, date of birth, policy numbers, addresses, email addresses, phone numbers, Social Security numbers, credit card information, debit card information, financial account information, driver's license information, health treatment information, health diagnosis information, prescription information, and health condition information.

142.    Plaintiff Moss is very careful with his Private Information. He stores any documents containing his Private Information in a safe and secure location or destroys the documents. Plaintiff Moss has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source. Moreover, Plaintiff Moss diligently chooses unique usernames and passwords for his various online accounts.

143.    As a result of the Data Breach, Plaintiff Moss made reasonable efforts to mitigate the impact of the Data Breach after receiving the Data Breach notification letter, including but not limited to researching the Data Breach, reviewing credit card and financial account statements, and monitoring his credit.

144.    Plaintiff Moss was forced to spend multiple hours attempting to mitigate the effects of the Data Breach. He will continue to spend valuable time he otherwise would have spent on other activities, including but not limited to time with his family, work and/or recreation. This is time that is lost forever and cannot be recaptured.

145.    Plaintiff Moss suffered actual injury and damages as a result of the Data Breach including, but not limited to: (a) damage to and diminution in the value of his Private Information, a form of intangible property that Defendant obtained from Plaintiff Moss; (b) violation of his

privacy rights; (c) the theft of his Private Information; (d) loss of time; (e) imminent and impending injury arising from the increased risk of identity theft and fraud; (f) increased out-of-pocket medical expenses; (g) failure to receive the benefit of his bargain; and (h) nominal and statutory damages.

146.     Plaintiff Moss has also suffered emotional distress that is proportional to the risk of harm and loss of privacy caused by the theft of his Private Information which he believed would be protected from unauthorized access and disclosure, including anxiety about unauthorized parties viewing, selling, and/or using his Private Information for purposes of identity theft and fraud.

147.     As a result of the Data Breach, Plaintiff Moss anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff Moss will continue to be at a present, imminent, and continued increased risk of identity theft and fraud in perpetuity.

148.     Plaintiff Moss has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains in Defendant's possession, is protected and safeguarded from future breaches.

### Plaintiff Demaro's Experience

149.     Plaintiff Demaro utilized Prudential's services and products for her retirement investments, children's college investments and life insurance. While Plaintiff Demaro no longer utilizes Prudential for her retirement investments, for the past almost 20 years, she has and continues to use Prudential for her children's college investments and life insurance. To use Defendant's services, Plaintiff Demaro—like other Class Members—provided sensitive Private Information including her full name, address, date of birth, phone number, and more.

150.    Defendant obtained and stored and maintained Plaintiff Demaro's and Class Members' Private Information. Defendant owes Plaintiff Demaro a legal duty and obligation to protect her Private Information from unauthorized access and disclosure. Prudential notified Plaintiff Demaro on June 10, 2024, over four months after it had discovered the Data Breach, that her Private Information was compromised in the Data Breach and disclosed as a result of Defendant's inadequate data security practices.[49]

151.    Over three months after the Data Breach, Defendant has yet to confirm the exact information that was compromised in the Data Breach. However, on information and belief, Class Members' compromised data includes, but is not limited to: customer first name, last name, address, date of birth, policy numbers, addresses, email addresses, phone numbers, Social Security numbers, credit card information, debit card information, financial account information, driver's license information, health treatment information, health diagnosis information, prescription information, and health condition information.

152.    Plaintiff Demaro is very careful with her Private Information. She stores any documents containing her Private Information in a safe and secure location or destroys the documents. Plaintiff Demaro has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source. Moreover, Plaintiff Demaro diligently chooses unique usernames and passwords for her various online accounts.

153.    As a result of the Data Breach, Plaintiff Demaro made reasonable efforts to mitigate the impact of the Data Breach after receiving the Data Breach notification letter, including but not limited to researching the Data Breach, reviewing credit card and financial account statements,

---

[49] Attached as Exhibit "B" is the redacted June 10, 2024 Notice of Security Incident received by Plaintiff Demaro.

and monitoring her credit.

154.    Plaintiff Demaro has been forced to spend multiple hours attempting to mitigate the effects of the Data Breach. She will continue to spend valuable time she otherwise would have spent on other activities, including but not limited to time with her family, work and/or recreation. This is time that is lost forever and cannot be recaptured.

155.     Plaintiff Demaro suffered actual injury and damages as a result of the Data Breach including, but not limited to: (a) damage to and diminution in the value of her Private Information, a form of intangible property that Defendant obtained from Plaintiff Demaro; (b) violation of her privacy rights; (c) the theft of her Private Information; (d) loss of time; (e) imminent and impending injury arising from the increased risk of identity theft and fraud; (f) increased out-of-pocket medical expenses; (g) failure to receive the benefit of her bargain; and (h) nominal and statutory damages.

156.    Plaintiff Demaro has also suffered emotional distress that is proportional to the risk of harm and loss of privacy caused by the theft of her Private Information which she believed would be protected from unauthorized access and disclosure, including anxiety about unauthorized parties viewing, selling, and/or using her Private Information for purposes of identity theft and fraud.

157.    As a result of the Data Breach, Plaintiff Demaro anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff Demaro will continue to be at a present, imminent, and continued increased risk of identity theft and fraud in perpetuity.

158.    Plaintiff Demaro has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains in Defendant's possession, is protected and

safeguarded from future breaches.

## **CLASS ACTION ALLEGATIONS**

159.    Plaintiffs bring this action against Defendant individually and on behalf of all other persons similarly situated.

160.    Plaintiffs propose the following Class and Subclass definitions, subject to amendment as appropriate:

> **National Class: All persons or, if minors, their parents or guardians, or, if deceased, their executors or surviving spouses, who Defendant identified as being among those individuals whose Private Information was compromised in the Data Breach (the "Class").**

161.    Excluded from the Class are Defendant's officers, directors, and employees; any entity in which Defendant have a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendant. Excluded also from the Class are members of the judiciary to whom this case is assigned, their families and members of their staff.

162.    Plaintiffs reserve the right to amend or modify the Class or Subclass definition or create additional subclasses as this case progresses.

163.    Numerosity. The Members of the Class are so numerous that joinder of all of them is impracticable. As of June 28, 2024, Prudential has identified over 2.5 million individuals affected by the Data Breach.

164.    Commonality. There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

>    a.    Whether Defendant unlawfully used, maintained, lost, or disclosed Plaintiffs' and Class Members' Private Information;

b.  Whether Defendant failed to implement and maintain reasonable and adequate security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c.  Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations including, *e.g.*, HIPAA;

d.  Whether Defendant's data security systems prior to and during the Data Breach were consistent with industry standards;

e.  Whether Defendant owed a duty to Plaintiffs and Class Members to safeguard their Private Information;

f.  Whether Defendant breached their duty to Plaintiffs and Class Members to safeguard their Private Information;

g.  Whether Defendant knew or should have known that their data security systems and monitoring processes were deficient;

h.  Whether Defendant should have discovered the Data Breach sooner;

i.  Whether Plaintiffs and Class Members suffered legally cognizable damages as a result of Defendant's misconduct;

j.  Whether Defendant's conduct was negligent;

k.  Whether Defendant breached implied contracts with Plaintiffs and Class Members;

l.  Whether Defendant were unjustly enriched by unlawfully retaining a benefit conferred upon them by Plaintiffs and Class Members;

m. Whether Defendant failed to provide notice of the Data Breach in a timely

41

manner, and;

n.   Whether Plaintiffs and Class Members are entitled to damages, civil penalties, punitive damages, treble damages, and/or injunctive relief.

165.   <u>Typicality</u>. Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' information, like that of every other Class Member, was compromised in the Data Breach.

166.   <u>Adequacy of Representation</u>. Plaintiffs will fairly and adequately represent and protect the interests of the Members of the Class. Plaintiffs' Counsel are competent and experienced in litigating class actions.

167.   <u>Predominance</u>. Defendant has engaged in a common course of conduct toward Plaintiffs and Class Members, in that all the data of Plaintiffs and Class Members was stored on the same network and unlawfully accessed in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

168.   <u>Superiority</u>. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, to conduct this action as a class action presents far fewer management

42

difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

169.     Defendant has acted on grounds that apply generally to the Class as a whole, so that Class certification, injunctive relief, and corresponding declaratory relief are appropriate on a classwide basis.

170.     Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

    a.  Whether Defendant failed to timely notify the public of the Data Breach;

    b.  Whether Defendant owed a legal duty to Plaintiffs and the Class to exercise due care in collecting, storing, and safeguarding their Private Information;

    c.  Whether Defendant's security measures and workforce training protocols to protect their data systems were reasonable and adequate in light of best practices recommended by data security experts;

    d.  Whether Defendant's failure to institute adequate protective security measures amounted to negligence;

    e.  Whether Defendant failed to take commercially reasonable steps to safeguard consumer Private Information; and

    f.  Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

171.     Finally, all members of the proposed Class are readily ascertainable. Defendant has access to names and addresses of Class Members affected by the Data Breach. Class Members

have already been preliminarily identified and sent notice of the Data Breach by Defendant.

## CLAIMS FOR RELIEF

### COUNT I
### Negligence and Negligence Per Se
### (*On Behalf of Plaintiffs and the Class*)

172.    Plaintiffs re-allege and incorporate by reference factual allegations above as if fully set forth herein.

173.    By collecting and storing the Private Information of Plaintiffs and Class Members, in their computer systems and networks, and using it for commercial gain, Defendant owed a duty of care to use reasonable means to secure and safeguard their computer systems—and Class Members' Private Information held within it—to prevent disclosure of the information, and to safeguard the information from theft. Defendant's duty included a responsibility to implement processes by which they could detect a breach of their security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

174.    Defendant owed a duty of care to Plaintiffs and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that their systems and networks, and the personnel responsible for them, adequately protected the Private Information.

175.    Plaintiffs and Class Members are a well-defined, foreseeable, and probable group of patients that Defendant was aware, or should have been aware, could be injured by inadequate data security measures.

176.    Defendant's duty of care to use reasonable and adequate security measures and to adequately train its workforce in reasonable data security protocols arose as a result of the special relationship that existed between Defendant and consumers, which is recognized by laws and

regulations including but not limited to HIPAA, the FTC Act, and common law. Defendant was in a superior position to ensure that their systems were sufficient to protect against the foreseeable risk of harm to Plaintiffs and Class Members from a data breach.

177.    Defendant's duty to use reasonable security measures under HIPAA required Defendant to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(1). Some or all of the medical information at issue in this case constitutes "protected health information" within the meaning of HIPAA.

178.    In addition, Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair... practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

179.    Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential Private Information.

180.    Defendant breached its duties, and thus were negligent, by failing to use reasonable measures to protect Plaintiffs' and Class Members' Private Information. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

  a.   Failing to adopt, implement, and maintain reasonable and adequate security measures to safeguard Plaintiffs' and Class Members' Private Information;

  b.   Failing to adequately monitor the security of its networks and systems;

  c.   Failing to ensure that its email systems had reasonable data security safeguards

in place;

d.  Failing to have in place reasonable and adequate mitigation policies and procedures;

e.  Allowing unauthorized access to Plaintiffs' and Class Members' Private Information;

f.  Failing to detect in a timely manner that Plaintiffs' and Class Members' Private Information had been compromised; and

g.  Failing to timely notify Plaintiffs and Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

181.    Plaintiffs and Class Members have no ability to protect their Private Information that was or remains in Defendant's possession.

182.    It was foreseeable that Defendant's failure to use reasonable measures to protect Plaintiffs' and Class Members' Private Information would result in injury to Plaintiffs and Class Members. Furthermore, the breach of security was reasonably foreseeable given the FBI and CISA's December 2023 notice concerning ALPHV Blackcat, Defendant's prior data breach, and the known high frequency of cyberattacks and data breaches in the healthcare industry.

183.    It was therefore foreseeable that the failure to adequately safeguard Plaintiffs' and Class Members' Private Information would result in one or more types of injuries to Plaintiffs and Class Members.

184.    Defendant's conduct was grossly negligent and departed from reasonable standards of care, including but not limited to, failing to adequately protect the Private Information, and failing to provide Plaintiffs and Class Members with timely notice that their sensitive Private

1000029.1

Information had been compromised.

185.    Neither Plaintiffs nor Class Members contributed to the Data Breach and subsequent misuse of their Private Information as described in this Complaint.

186.    Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to, *inter alia,* (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

187.    The injury and harm Plaintiffs and Class Members suffered was the reasonably foreseeable result of Defendant's breach of their duties. Defendant knew or should have known that they were failing to meet their duties, and that Defendant's breach would cause Plaintiffs and Class Members to experience the foreseeable harms associated with the exposure of their Private Information.

188.    As a direct and proximate result of Defendant's negligent conduct, Plaintiffs and Class Members have suffered injury and are entitled to compensatory and consequential damages in an amount to be proven at trial.

## COUNT II
### Breach of Implied Contract
### *(On behalf of Plaintiffs and the Class)*

189.    Plaintiffs re-allege and incorporate by reference factual allegations above as if fully set forth herein.

190.    Defendant acquired and maintained the Private Information of Plaintiffs and the Class that they received either directly or from their healthcare providers.

191.    When Plaintiffs and Class Members paid money and provided their Private Information to Prudential, they entered into implied contracts with Defendant and its affiliates.

192.    Plaintiffs and Class Members entered into implied contracts with Defendant under which Defendant agreed to safeguard and protect such information and to timely and accurately notify Plaintiffs and Class Members that their information had been breached and compromised.

193.    Plaintiffs and the Class were required to deliver their Private Information to Defendant as part of the process of obtaining services and products provided by Defendant. Plaintiffs and Class Members paid money, or money was paid on their behalf, to Defendant in exchange for services and products.

194.    Defendant directly solicited, offered, and invited Class Members to provide their Private Information as part of Defendant's regular business practices. Plaintiffs and Class Members accepted Defendant offers and provided their Private Information to Defendant.

195.    Defendant accepted possession of Plaintiffs' and Class Members' Private Information for the purpose of providing services and products to Plaintiffs and Class Members.

196.    In accepting such information and payment for services and products, Defendant entered into implied contracts with Plaintiffs and Class Members whereby Defendant became obligated to reasonably safeguard Plaintiffs' and Class Members' Private Information.

197.    In delivering their Private Information to Defendant and paying for its products and services, Plaintiffs and Class Members intended and understood that Defendant would adequately safeguard the data as part of that service.

198.    The implied promise of confidentiality includes consideration beyond those pre-existing general duties owed under HIPAA or other state of federal regulations. The additional consideration included implied promises to take adequate steps to comply with specific industry data security standards and FTC guidelines on data security.

199.    The implied promises include but are not limited to: (1) taking steps to ensure that

any workforce members who are granted access to Private Information also protect the confidentiality of that data; (2) taking steps to ensure that the information that is placed in the control of its workforce members is restricted and limited to achieve an authorized purpose; (3) restricting access to qualified and trained workforce members; (4) designing and implementing appropriate retention policies to protect the information against criminal data breaches; (5) applying or requiring proper encryption; (6) multifactor authentication for access; and (7) other steps to protect against foreseeable data breaches.

200.    Plaintiffs and Class Members would not have entrusted their Private Information to Defendant in the absence of such an implied contract.

201.    Had Defendant disclosed to Plaintiffs and Class Members that they did not have adequate computer systems and security practices to secure sensitive data, Plaintiffs and Class Members would not have provided their Private Information to Defendant.

202.    Defendant recognized that Plaintiffs' and Class Members' Private Information is highly sensitive and must be protected, and that this protection was of material importance as part of the bargain with Plaintiffs and Class Members.

203.    Plaintiffs and Class Members fully performed their obligations under the implied contracts with Defendant.

204.    Defendant breached the implied contracts with Plaintiffs and Class Members by failing to take reasonable and adequate measures to safeguard their Private Information as described herein.

205.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members suffered and will continue to suffer damages in an amount to be proven at trial.

49

## COUNT III
### Unjust Enrichment
#### *(On Behalf of Plaintiffs and the Class)*

206.     Plaintiffs re-allege and incorporate by reference all factual allegations above as if fully set forth herein.

207.     This count is pleaded in the alternative to the breach of contract claims (Count II).

208.     Upon information and belief, Defendant funds any data security measures it implements entirely from its general revenue, including from money they make based upon representations of protecting Plaintiffs' and Class Members' Private Information.

209.     There is a direct nexus between money paid to Defendant and the requirement that Defendant keep Plaintiffs' and Class Members' Private Information confidential and protected.

210.     Plaintiffs and Class Members paid Defendant a certain sum of money, which was used to fund any data security measures implemented by Defendant.

211.     As such, a portion of the payments made by or on behalf of Plaintiffs and Class Members is to be used to provide a reasonable and adequate level of data security, and the amount of the portion of each payment made that is allocated to data security is known to Defendant.

212.     Protecting the Private Information of Plaintiffs and Class Members is integral to Defendant's business. Without their data, Defendant would be unable to provide goods and services, including the life insurance, health insurance, annuities, retirement-related services, mutual funds, and investment management that comprise of Defendant's core business.

213.     Plaintiffs' and Class Members' data and Private Information has monetary value.

214.     Plaintiffs and Class Members directly conferred a monetary benefit on Defendant by purchasing goods and/or services from Defendant and by supplying Defendant with their Private Information, which has value, from which value Defendant derive their business value,

50

and which should have been protected with adequate data security.

215.    Defendant knew that Plaintiffs and Class Members conferred a benefit which Defendant accepted. Defendant profited from these transactions and used the Private Information of Plaintiffs and Class Members for business purposes.

216.    Defendant enriched itself by saving the costs they reasonably should have expended on adequate data security measures to secure Plaintiffs' and Class Members' Private Information. Instead of providing a reasonable and adequate level of security that would have prevented the Data Breach, Defendant instead chose to shirk its data security obligations to increase profits at the expense of Plaintiffs and Class Members by utilizing cheaper, ineffective data security measures. Plaintiffs and Class Members suffered as a direct and proximate result of Defendant's calculated failures to provide the requisite reasonable and adequate data security.

217.    Under the principles of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiffs and Class Members, because Defendant failed to implement reasonable and adequate data management and security measures that are mandated by federal law and industry standards.

218.    Defendant acquired the monetary benefit and Private Information through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

219.    If Plaintiffs and Class Members knew that Defendant had not secured their Private Information, they would not have agreed to provide their Private Information to Defendant.

220.    Plaintiffs and Class Members have no adequate remedy at law.

221.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity to control how their Private Information is used; (iii) the

compromise, publication, and/or theft of their Private Information; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (v) lost opportunity costs associated with effort expended and loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their Private Information, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fail to undertake appropriate and adequate measures to protect Private Information in its continued possession; (vii) loss or privacy from the authorized access and exfiltration of their Private Information; and (viii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members.

222.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

223.    Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class Members, proceeds that it unjustly received from them. In the alternative, Defendant should be compelled to refund the amounts that Plaintiffs and Class Members overpaid for Defendant's services.

**COUNT IV**
**Bailment**
***(On Behalf of Plaintiffs and the Class)***

224.    Plaintiffs re-allege and incorporate by reference all factual allegations above as if fully set forth herein.

225.    Plaintiffs and Class Members provided Private Information to Defendant, which

52

Defendant was under a duty to keep private and confidential.

226.    Plaintiffs' and Class Members' Private Information is personal property and was conveyed to Defendant for the certain purpose of keeping the information private and confidential.

227.    Plaintiffs' and Class Members' Private Information has value and is highly prized by hackers and criminals. Defendant was aware of the risks it took when accepting the Private Information for safeguarding and assumed the risk voluntarily.

228.    Once Defendant accepted Plaintiffs' and Class Members' Private Information, it was in the exclusive possession of that information, and neither Plaintiffs nor Class Members could control that information once it was within the possession, custody, and control of Defendant.

229.    Defendant did not safeguard Plaintiffs' or Class Members' Private Information when it failed to adopt and implement reasonable and adequate data security safeguards to prevent the known risk of a cyberattack.

230.    Defendant's failure to safeguard Plaintiffs' and Class Members' Private Information resulted in that information being accessed or obtained by third-party cybercriminals.

231.    As a result of Defendant's failure to keep Plaintiffs' and Class Members' Private Information secure, Plaintiffs and Class Members suffered injury, for which compensation— including nominal damages and compensatory damages—are appropriate.

### COUNT V
### Breach of Fiduciary Duty
### *(On Behalf of Plaintiffs and the Class)*

232.    Plaintiffs re-allege and incorporate by reference all factual allegations above as if fully set forth herein.

233.    In light of the special relationship between Defendant and Plaintiffs and Class

Members, Defendant became fiduciaries by undertaking a guardianship of the Private Information to act primarily for Plaintiffs and Class Members: (1) for the safeguarding of Plaintiffs' and Class Members' Private Information; (2) to timely notify Plaintiffs and Class Members of a Data Breach and disclosure; and (3) to maintain complete and accurate records of what information (and where) Defendant do store.

234.    Defendant had a fiduciary duty to act for the benefit of Plaintiffs and Class Members upon matters within the scope of their relationship to keep secure their Private Information.

235.    Defendant breached their fiduciary duty to Plaintiffs and Class Members by failing to encrypt and otherwise protect the integrity of the systems containing Plaintiffs' and Class Members' Private Information.

236.    Defendant breached their fiduciary duty to Plaintiffs and Class Members by otherwise failing to safeguard Plaintiffs' and Class Members' Private Information.

237.    As a direct and proximate result of Defendant's breach of their fiduciary duties, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the compromise, publication, and/or theft of their Private Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their Private Information; (iv) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (v) the continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fail to undertake appropriate and adequate measures to protect the Private Information in its continued possession; (vi) future costs in terms of time, effort, and

money that will be expended as result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members; and (vii) the diminished value of Defendant's services they received.

238.    As a direct and proximate result of Defendant's breach of its fiduciary duties, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm, and other economic and non-economic losses.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for judgment as follows:

a)    For an Order certifying this action as a Class Action and appointing Plaintiffs as Class Representatives and their counsel as Class Counsel;

b)    For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiffs' and Class Members' Private Information, and from refusing to issue prompt, complete and accurate disclosures to Plaintiffs and Class Members;

c)    For equitable relief compelling Defendant to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety, and to disclose with specificity the type of Private Information compromised during the Data Breach;

d)    For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;

e)    Ordering Defendant to pay for not less than five years of credit monitoring services for Plaintiffs and the Class;

f)    For an award of actual damages, compensatory damages, statutory damages, nominal damages, and/or statutory penalties, in an amount to be determined, as allowable by law;

g)    For an award of punitive damages, as allowable by law;

h)      Pre- and post-judgment interest on any amounts awarded; and,

i)      Such other and further relief as this court may deem just and proper.

## **JURY TRIAL DEMANDED**

Under Federal Rule of Civil Procedure 38(b), Plaintiffs demands a trial by jury of any and all issues in this action so triable as of right.

Dated: July 11, 2024

Respectfully submitted,

*/s/ Joseph J. DePalma*
Joseph J. DePalma
Catherine B. Derenze
**LITE DEPALMA GREENBERG & AFANADOR, LLC**
570 Broad Street, Suite 1201
Newark, NJ 07102
Tel: 973-623-3000
Fax: 973-623-0858
jdepalma@litedepalma.com
cderenze@litedepalma.com

James J. Pizzirusso*
**HAUSFELD LLP**
888 16th Street, N.W., Suite 300
Washington, D.C. 20006
(202) 540-7200
jpizzirusso@hausfeld.com

Steven M. Nathan*
**HAUSFELD LLP**
33 Whitehall Street, Fourteenth Floor
New York, NY 10004
(646) 357-1100
snathan@hausfeld.com

*Counsel for Plaintiffs*

***Pro Hac Vice Forthcoming***

56

## CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2

Pursuant to Local Civil Rule 11.2, I hereby certify that the matter in controversy is related to the following civil actions.

Federal:

- *Adinolfi v. The Prudential Insurance Company of America*, Case No. 2:24-cv-07066 (D.N.J.)

- *Boyd v. The Prudential Insurance Company of America*, Case No. 2:24-cv-06818 (D.N.J.)

- *Khaner v. The Prudential Insurance Company of America*, Case No. 2:24-cv-07671 (D.N.J.)

- *Smith v. The Prudential Insurance Company of America*, Case No. 2:24-cv-07598 (D.N.J.)

- *Villareal v. The Prudential Insurance Company of America*, Case No. 2:24-cv-07683 (D.N.J.)

- *Wright v. The Prudential Insurance Company of America*, Case No. 2:24-cv-07691 (D.N.J.)

I hereby certify that the following statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

**LITE DEPALMA GREENBERG & AFANADOR, LLC**

Dated: July 11, 2024

*/s/ Joseph J. DePalma*
Joseph J. DePalma
Catherine B. Derenze
570 Broad St., Suite 1201
Newark, NJ 07102
Telephone: (973) 623-3000
Facsimile: (973) 623-0858
jdepalma@litedepalma.com
cderenze@litedepalma.com

***Counsel for Plaintiffs***

1000029.1

**HAUSFELD LLP**
James Pizzirusso*
888 16th St., Ste 300
Washington, DC 20006
Telephone: (202) 540-7200
jpizzirusso@hausfeld.com

**HAUSFELD LLP**
Steven Nathan*
33 Whitehall Street
14th Floor
New York, NY 10004
Telephone: (646) 357-1100
snathan@hausfeld.com

*Counsel for Plaintiffs*

***Pro Hac Vice Forthcoming**

# EXHIBIT A



# Prudential


547_0106673

June 24, 2024

**JOHN MOSS**

███████████████████

,, lll, l'l'• l, l l'l'll ll II''l l•ll, lll lllll,lllll,,,, ll,l•ll•ll, h h I

### Notice of Security Incident

Dear John:

At Prudential, we take seriously our commitment to protect the information we manage on behalf of our customers, employees, and company. We are writing to let you know we recently experienced a cybersecurity incident that affected some of your personal information.

We are providing you with information about the incident, our response, and additional measures you can take to help protect yourself. Importantly, we are not aware of fraud or misuse of your personal information resulting from this incident.

**What Happened?**
On February 5, 2024, Prudential detected unauthorized third-party access to certain company systems and data. We promptly activated our incident response plan and launched an investigation into the nature and scope of the issue with assistance from external cybersecurity experts. We also reported this matter to relevant law enforcement. Through the investigation, we learned that the unauthorized third party gained access to our network on February 4, 2024 and removed a small percentage of personal information from our systems.

**What Information Was Involved?**
Our investigation determined that information related to your Prudential products and services was affected by this incident. This information included your name, address, date of birth, email, phone number, and policy number.

**What We Are Doing.**
Prudential takoG- this incident and our ro3poncsibility to protect your per.:50naf information extremely serlous1y. As part of our response, we have worked with leading cybersecurity experts to confirm the unauthorized third party no longer has access to our company systems. We also have taken proactive measures to protect our systems and data, including enhancing access controls and security protocols, and implementing additional monitoring technologies and procedures, aro.ong ob_er actlons. We are also taking steps to strengthen our authentication protocols and help protect.access to .your account.

While we are not aware of identity theft or fraud related to information affected by this incident, as an additional precaution, we are providing you with 24 months of complimentary identity monitoring services. Details about this offer and instructions on how to activate these services are enclosed with this letter.

**What You Can Do.**
We encourage you to remain vigilant and review your account statements and free credit reports regularly to ensure there is no unauthorized or explained activity. We also encourage you to activate the complimentary identity monitoring services that we are offering. Please review the enclosed **Steps You Can Take to Help Protect Personal Information,** which contains details about this offer and general guidance on what you can do to safeguard against possible future misuse of your information.

ELN-21561

## Steps You can Take to Help Protect Personal Information

### Activate Kroll's Identity Monitoring services

In response to this incident, we have secured the services of Kroll to provide identity monitoring at no cost to you for 24 months. Kroll is a global leader in risk mitigation and response, and their team has extensive experience helping people who have sustained an unintentional exposure of confidential data. Your identity monitoring services Credit Monitoring, a Current Credit Report, Web Watcher, Public Persona, Quick Cash Scan, $1 Million Identity Fraud Loss Reimbursement, Fraud Consultation, and Identity Theft Restoration.

Visit **https:lIenroU.kroUmonItorjnq.com** to activate and take advantage of your identity monitoring services. **You have until September 30, 2024 to activate your identity monitoring seNices.**

Membership Number: ENBP66949•P

For more information about Kroll and your Identity Monitoring services, you can visit info.krollmonitoring.com.

# KRCILL

## TAKE ADVANTAGE OF YOUR IDENTITY MONITORING SERVICES

You have been provided with access **to** the following services from Kroll:

### Triple Bureau Credit Monitoring and Single Bureau Credit Report

Your current credit report is available for you to review. You will also receive alerts when there are changes to your credit data at any of the three national credit bureaus-for instance, when a new line of credit is applied for in your name. If you do not recognize the activity, you will have the option to call a Kroll fraud specialist, who will be able to help you determine if it is an indicator of identity theft.

### Web Watcher

Web Watcher monitors internet sites where criminals may buy, sell, and trade personal identity information. An alert will be generated if evidence **of** your personal identity information is found.

### Public Persona

Public Persona monitors and notifies when names, aliases, and addresses become associated with your Social Security number. If information is found, you will receive an alert.

### Quick Cash Scan

Quick Cash Scan monitors short-term and cash-advance loan sources. You will receive an alert when a loan is reported, and you can call a Kroll fraud specialist for more information.

### $1 Million Identity Fraud Loss Reimbursement

Roimbursoe you for o_t-oF-pookol expenses totaling up to $1 million In covered legal costs and expense:; **for any** one stolen identity event. All coverage is subject to the conditions and exclusions in the policy.

### Fraud Consultation

You ha!e unlimited access to consultation_with a Kroll fraY.d speciali t. . Support_includes showing you th!) mosteffe,;_tive ways to protect your identity, explaining your rights and protections under the law, assistance with fraud alerts, and interpreting how personal information is accessed and used, including investigating suspicious activity that could be tied to an identity theft event.

### Identity Theft **Restoration**

If you become a victim of identity theft, an experienced Kroll licensed investigator will work on your behalf to resolve related issues. You will have access to a dedicated investigator who understands your issues and can do most of the worl< for you. Your investigator will be able to dig deep to uncover the scope of the identity theft, and then worl< to resolve it.

Kroll's activation website is only compatible with the current version or one version earlier of Chrome, Firefox, Safari and Edge.
To receive credit services, you must be over the age of 18 and have established credit in the U.S., have a Social Security number in your name, and have a U.S. residential address associated with your credit file.

### Monitor Your Accounts

Under U.S. law, a consumer is entitled to one free credit report annually from each of the three major credit reporting bureaus, Equifax, Experian, and TransUnion. To order a free credit report, visit www.annua1creditreport.com or call, toll-free, 1-877-322-8228. Consumers may also directly contact the three major credit reporting bureaus listed below to request a free copy of their credit report.



For New Mexico residents, consumers have rights pursuant to the Fair Credit Reporting Act, such as the right to be told if information in their credit file has been used against them, the right to know what is in their credit file, the right to ask for their credit score, and the right lo dispute incomplete or inaccurate information. Further, pursuant to the Fair Credit Reporting Act, the consumer reporting bureaus must correct or delete inaccurate, incomplete, or unverifiable information; consumer reporting agencies may not report outdated negative information; access to consumers' files is limited; consumers must give consent for credit reports to be provided to employers; consumers may limit "prescreened" offers of credit and insurance based on information in their credit report; and consumers may seek damages from violators. Consumers may have additional rights under the Fair Credit Reporting Act not summarized here. Identity theft victims and active-duty military personnel have specific additional rights pursuant to the Fair Credit Reporting Act. We encourage consumers to review their rights pursuant to the Fair Credit Reporting Act by visiting www.consumerfinance.gov/f/201504_cfpb_summary_your-rights-under-fcra.pdf, or by writing Consumer Response Center, Room 130-A, Federal Trade Commission, 600 Pennsylvania Ave. N.W., Washington, O.C. 20580.

For New York residents, the New York Attorney General may be contacted at: Office of the Attorney General, The Capitol, Albany, NY 12224-0341; 1-800-771-7755; or https://ag.ny.qoy.

For North Carolina residents, the North Carolina Attorney General may be contacted at: 9001 Mail Service Center, Raleigh, NC 27699-9001; 1-877-566-7226 or 1-919-716-6000; and WWW.ncdoj.gov.

For Rhode Island residents, the Rhode Island Attorney General may be reached at: 150 South Main Street, Providence, RI 02903: www.riag.rj goy; and 1-401-274:.«00. Under Rhode Island law, individuals have the right to obtain any police report filed in regard to this event. There are approximately 109 Rhode Island residents that may be impacted by this event.

# EXHIBIT B

# **Prudential**



337_0059089

June 10, 2024

STEPHANIE DEMARO

IIIII, II, I, IIII, IIIIIIII, II,III $h_{IIIIII}$, I,,, I, I,, II,III ••|• |j••••

## **Notice of Security Incident**

Dear Stephanie:

At Prudential, we take seriously our commitment to protect the information we manage on behalf of our customers, employees, and company. We are writing to let you know we recently experienced a cybersecurity incident that affected some of your personal information.

We are providing you with information about the incident, our response, and additional measures you can take to help protect yourself. Importantly, we are not aware of fraud or misuse of your personal information resulting from this incident.

### **What Happened?**
On February 5, 2024, Prudential detected unauthorized third-party access to certain company systems and data. We promptly activated our incident response plan and launched an investigation into the nature and scope of the issue with assistance from external cybersecurity experts. We also reported this matter to relevant law enforcement. Through the investigation, we learned that the unauthorized third party gained access to our network on February 4, 2024 and removed a small percentage of personal information from our systems.

### **What Information Was Involved?**
Our investigation determined that information related to your Prudential products and services was affected by this incident. This information included your name, address, date of birth, phone number, and Prudential ID number.

### **What We Are Doing.**
Prudential takes this incident and our responsibility to protect your personal information extremely seriously. As part of our response, we have worked with leading cybersecurity experts to confirm the unauthorized third party no longer has access to our company systems. We also have taken proactive measures to protect our systems and data, including enhancin§ access controls and security protocols, and implementing additional monitoring technologies and procedures, among other actions. We are also taking steps to strengthen our authentication protocols and help protect access to your account.

While we are not aware of identity theft or fraud related to information affected by this incident, as an additional precaution we are providing you with 24 months of complimen�ary i?entity monitoring services. Details about this offer and instruction� on how to activate these services are enclosed with this letter.

### **What You Can Do.**
We encourage you to remain vigilant and review your account statements and free credit reports regularly to ensure there is no unauthorized or explained activity. We also encourage you to activate the complimentary identity monitoring services that we are offering. Please review the enclosed *Steps You Can Take to Help Protect Personal Info$_{rm\ at}$ion* which contains details about this offer and general guidance on what you can do to safeguard against possible futur� misuse of your information.